# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

STEVE HAWKINS,

    Plaintiff

v.                       Case No.

CITY OF KENOSHA, CHIEF DANIEL C. WADE,
LT. LEWIS LINDQUIST, LT. STEVE LARSON,
OFFICER DANIEL DeJONGE, and SGT. CHUCK HANNES,
In their individual capacities,

    Defendants.

---

# COMPLAINT

---

## I.    NATURE OF ACTION

101.  This is a civil action brought by Plaintiff Hawkins under the Ku Klux Klan Act of 1871, Fourteenth Amendment to the U.S. Constitution, Title 42 U.S.C. § 1983, and provisions of the statutory and common law of the State of Wisconsin, in order to obtain damages to compensate Plaintiff Hawkins for injuries arising out of the invidious racial discrimination inflicted on Plaintiff Hawkins, for owning a business

which catered almost exclusively to African Americans, by the City of Kenosha and Chief Daniel C. Wade, Lt. Lewis Lindquist, Lt. Steve Larson, Officer Daniel DeJonge, and Sgt. Chuck Hannes of the Kenosha Police.

## II.  JURISDICTION AND VENUE

201.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction),

202.  The Eastern District of Wisconsin is the proper venue for this action because the Plaintiff's claims arise within the geographical boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III.  PARTIES

### A.  Plaintiff

301.  Plaintiff Steve Hawkins is a Caucasian adult resident of the State of Wisconsin, residing at 4625 75th Street, Kenosha, Wisconsin 53142.  Mr. Hawkins was the owner of Twisterz and conducted business at 6218 22nd Ave, Kenosha, WI.

### B.  Defendants

302.  Defendant City of Kenosha is a municipality within the State of Wisconsin with the capacity to sue and be sued in this Court.

2

303.   Defendant Chief Daniel C. Wade is a Caucasian adult resident of the State of Wisconsin and was, at all times pertinent, employed by the City of Kenosha Police Department.

304.   Defendant Lt. Lewis Lindquist is a Caucasian adult resident of the State of Wisconsin and was, at all times pertinent, employed by the City of Kenosha Police Department.

305.   Defendant Lt. Steve Larson is a Caucasian adult resident of the State of Wisconsin and was, at all times pertinent, employed by the City of Kenosha Police Department.

306.   Defendant Officer Daniel DeJonge is a Caucasian adult resident of the State of Wisconsin and was, at all times pertinent, employed by the City of Kenosha Police Department.

307.   Defendant Sgt. Chuck Hannes is a Caucasian adult resident of the State of Wisconsin and was, at all times pertinent, employed by the City of Kenosha Police Department.

308.   All of the individual Defendants are sued in their individual capacities.


## IV.   ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401.   At all times pertinent, Mr. Hawkins owned and operated the night club Twisterz in Kenosha, Wisconsin.

3

402.   Mr. Hawkins was initially granted a cabaret license by the Common Council for the City of Kenosha pursuant to § 10.07 of the Code of General Ordinances on March 23, 1987.

403.   Since 1992 and at all times pertinent, Twisterz was located at 6218 22nd Ave., Kenosha, WI.

404.   Twisterz played mainly top 40 hits and rock and roll from 1987 until 2000 and had a mostly white clientele.

405.   In 1997 and 1998, Twisterz had "college nights" every Thursday, which drew in approximately 400 to 600 white college students.

406.   Twisterz never had any problems with Kenosha, its police, or its officials as long as it had a predominantly white clientele.

407.   No one threatened or attempted to take away Twisterz's cabaret license as long as it had a predominantly white clientele.

408.   Twisterz started playing mainly hip hop and rap music in late 2000.

409.   With this change in music, in late 2000, Twisterz became less attractive to its primarily Caucasian clientele and more attractive to a new, almost exclusively African American, clientele.

410.   Shortly after this transformation, Mr. Hawkins began experiencing problems from the City of Kenosha and the Kenosha Police Department, including threats and attempts to revoke Mr. Hawkins's licenses.

4

411.  For instance, on April 13, 2001, Lt. Lewis Lindquist and Capt. Bob Reschke came to Twisterz.  Mr. Hawkins went outside to talk to Lt. Lindquist and Capt. Reschke.  Capt. Reschke jabbed Mr. Hawkins in the chest and told him that he had better stop what he was doing.  Mr. Hawkins asked what he meant by that.  Capt. Reschke said, "You know what you're doing."  Lt. Lindquist and Capt. Reschke told Mr. Hawkins that they could close him down like they did Jo Jo's, Neon Nights, and Pizzazz, three Kenosha bars that had been closed down after catering to a largely African American clientele.  Lt. Lindquist and Captain Reschke told Mr. Hawkins that they intended to begin videotaping Twisterz.  Lt. Lindquist and Captain Reschke told Mr. Hawkins that they had already met with some members of the City Council regarding revoking Twisterz's license.

412.  On October 8, 2001, Mr. Hawkins received a notification to attend a meeting of the City of Kenosha License and Permit Committee regarding the revocation of his liquor and cabaret licenses.

413.  On November 12, 2001, Mr. Hawkins and the City of Kenosha stipulated to new bar rules to be implemented at Twisterz. These stipulations provided that Twisterz would not be allowed to let patrons reenter the club once they left on nights on which a cover charge was collected; that Twisterz would have a 400-person capacity at all times, and that after capacity was reached, no one could stand in line so as to be able to enter when other patrons exited; that Mr. Hawkins would

5

maintain a record of attendance during the hours of operation and submit a monthly report of this information to the Kenosha Police Department; that Twisterz had to enforce a dress code; that Twisterz security personnel would not attempt to direct traffic, confront disorderly persons not on tavern premises, or patrol premises other than Twisterz's property; that Twisterz should call the police upon witnessing any violation of the state statutes or city ordinances, that such notifications were welcomed by the police, and that such notifications would not be the basis for the assessment of demerit points; that demerit points would be assessed only for violations of state statutes or city ordinances, the terms and conditions of the license, and for violations of Section 10.064 of the Code of Ordinances; that all performances should end at 2 a.m. with patrons leaving out both exits; that Mr. Hawkins should meet with the police periodically to work together to resolve the problems at Twisterz; and that Mr. Hawkins should improve his rear exterior lighting at Twisterz.

414. Mr. Hawkins agreed to these terms only because he wanted to avoid the expense and risk of proceedings aimed at revoking his licenses, and because he wanted to achieve some clarity regarding what was expected of him and his staff by the City, not because he believed his operation was really a trouble spot.

415. On November 20, 2001, an Order was issued recommending that the terms of stipulation between Kenosha and Mr. Hawkins be

adopted as Orders of the Common Council pursuant to § 10.064 of the Code of General Ordinances.

416.   Mr. Hawkins was being singled out and harassed by the City of Kenosha for catering to African American clientele.

417.   Mr. Hawkins was the only night club owner in Kenosha catering almost exclusively to an African American clientele at the time.

418.   Mr. Hawkins was the only cabaret licensee in Kenosha that had to make stipulations with the City of Kenosha.

419.   Mr. Hawkins was the only cabaret licensee in Kenosha that was compelled by the City of Kenosha to agree to limit the number of patrons to a number significantly lower than the capacity of the premises.

420.   Mr. Hawkins was the only cabaret licensee who was compelled by the City of Kenosha to agree to not allow its patrons back in after they stepped out.

421.   Mr. Hawkins was the only cabaret licensee who was compelled by the City of Kenosha to agree to enforce a dress code and deny access to persons wearing certain articles of clothing.

422.   Mr. Hawkins and Twisterz were being strategically and maliciously set up to fail by the City of Kenosha and its police department.

423.   Twisterz was prohibited by the Orders of Common Council from controlling any area outside Twisterz, and the Kenosha police

promised to control that area, yet the Kenosha police purposely were not proactive in controlling the area outside of Twisterz, but would simply videotape incidents and then blame Twisterz for those incidents that Twisterz, by Orders of the Common Council, could not have addressed if it had wanted to.

424.   Twisterz was prohibited by the Orders of Common Council form handling any incident outside of Twisterz and was ordered to call the police instead.  Twisterz was promised that the police would welcome these calls and not use them against Twisterz; however, the City of Kenosha and its police assessed demerit points and attempted to revoke Twisterz's cabaret license for having too many police calls and using too many police services.

425.   Twisterz was promised through the Orders of Common Council that demerit points would only be assessed for violations; however, Twisterz was assessed demerit points even though it never had a violation.

426.   Twisterz was being set up to fail in these ways because the defendants had conspired to either close down Twisterz or revoke its cabaret license so that Twisterz could no longer cater to African Americans in Kenosha.

427.   On November 24, 2001, Defendant Chief Wade issued an email to supervising officers of the Kenosha Police Department stating

8

that the police really needed "to get the place closed or prohibit entertainment altogether."

428. Alderman Ruffolo was belligerent about wanting Twisterz closed down, even though he was supposed to be impartial.

429. Sometime in early 2002, City of Kenosha Alderman Ruffolo announced at a breakfast with Jerry Kurth and about 7 other men, mostly city officials, that he was planning to shut Twisterz down because the owner of Spot Drive In, a drive-up diner, did not like having blacks come to eat at his restaurant. Alderman Ruffolo also stated that he and his girlfriend were upset once because they had been caught in traffic that the blacks had caused around Twisterz late at night.

430. A few weeks later, Capt. Reschke went to Shenanigans and announced to the owner, Jerry Kurth, that the Kenosha police were going to shut down Twisterz. Capt. Reschke listed the same reasons Alderman Ruffolo previously gave for wanting to shut Twisterz down.

431. On March 30, 2002, Lt. Larson began documenting alleged problems at Twisterz in an incident log.

432. Twisterz was being singled out by the City of Kenosha and its police department for having African American clientele by being the only holder of a cabaret license for which the police maintained an incident log.

433. On June 3, 2002, Lt. Lindquist sent an email to other officers recommending that they back off patrolling Twisterz because if

9

they were successful in keeping the area problem-free they would not be able to permanently solve the problem of Twisterz's existence by pulling Mr. Hawkins's license.  In this email he directed other officers to, "let things get ugly."

434.   On June 27th, 2002, at the License and Permit Committee Hearing, in an attempt to appease the City and foster a friendly working relationship, Mr. Hawkins voluntarily agreed to educate his patrons that the club would not tolerate any inappropriate behavior through table tents, hand bills, and D.J. announcements.

435.   Mr. Hawkins was always very cooperative with the City of Kenosha and its Chief of Police.

436.   On July 3, 2002, Mr. Hawkins met with Lt. Larson and Kenosha City Attorney Sheehan.  At this meeting, Lt. Larson admitted that Twisterz was the only bar in Kenosha under videotape surveillance by the Kenosha Police Department.

437.   From July 11, 2002 though October 26, 2002, Mr. Hawkins's then attorney, Mr. Mitz, sent a weekly letter to the Kenosha City Attorney Sheehan reporting that there had been no incidents at Twisterz over the previous weekend.  Mr. Sheehan never took the time to respond to even one of these letters.

438.   On October 12, 2002, Lt. Larson wrote a memo to the License and Permit Committee stating that the city fathers needed to

send a message to other tavern owners that bars with the documented incidents and arrests that Twisterz's has will not be allowed to operate.

439.   However, Twisterz had not received any citations for any incidents within the club.

440.   There was never a violation of law within Twisterz.

441.   Nor were there arrests made for incidents occurring within Twisterz.

442.   Any incidents which occurred outside of Twisterz were incidents commonly associated with persons who had been drinking alcohol, and were neither different in nature nor more severe than the incidents commonly occurring outside those bars and nightclubs in Kenosha with predominantly white clienteles.

443.   The Kenosha police would blame Twisterz for any incident in Kenosha involving an African American if the incident took place during or shortly after Twisterz's hours of operation.

444.   On October 16, 2002 Mr. Hawkins was instructed to attended a License and Permit Committee hearing on October 28, 2002 because there were allegedly a number of police complaints at Twisterz, despite the fact that Mr. Hawkins and Attorney Mitz had documented that there were no incidents at Twisterz every weekend from July 11, 2002 to October 26, 2002, without a contrary response from the city.

445.   On November 3, 2002, Mr. Hawkins bought and began using a timed remote camera to tape the outside of Twisterz.

446.   On November 10, 2002, the Kenosha police officers Riesselmann and DeJonge reported that, at approximately closing time, they came upon a riot lasting over 20 minutes at Twisterz.

447.   The Kenosha City police publicized the alleged riot and Lt. Larson sent out a press release on November 10, 2002, stating that a crowd of 250 people spilled into the streets and a large group of Twisterz patrons surrounded a squad car and pelted it with bottles, threw bottles at cars and people in the area, and engaged in numerous fights.  The press release claimed that 20 officers made unheeded attempts to disperse the crowd, that at least 3 people were struck by bottles, and that an estimated 200 people were punching and kicking each other. The press release claimed that officers used pepper spray until it was gone to disperse the crowd, then they used batons.  The press release claimed that only two arrests were made because officers were dangerously outnumbered.

448.   Fox 6 News aired a report stating that according to the City of Kenosha police there was a riot at Twisterz.

449.   Fox 6 News described the riot as a "drunken mob."

450.   Fox 6 News showed a clip of Sgt. Chuck Hannes of the Kenosha Police Department talking, during which he stated that there were 200 or 250 people in the street fighting, throwing bottles, and acting disorderly and that pepper spray did not work.  He said there were

30 to 40 people pounding and kicking on a squad car while swearing. He said, "We would like to see them closed down."

451.   Fox 6 News reported that there were 15 to 20 different fights.

452.   Fox 6 News reported that every officer and squad car in the city, except for two, were needed to get the riot under control.

453.   Fox 6 News reported that, "the problem wasn't the riot itself, but the fact that it happens at Twisterz far too often."

454.   Fox 6 News reported, "Cops call Twisterz an outright nuisance – a club catering to hip hop and rap."

455.   When the Kenosha police called Twisterz, "a club catering to hip hop and rap," they meant, "a club catering to African Americans."

456.   Later, Fox 6 News showed clips of surveillance tapes of Twisterz on the night of the alleged riot which displayed no riot-like activity like the activities that the Kenosha police had alleged.

457.   In fact, the alleged riot at Twisterz never happened.

458.   This riot was fabricated by the Kenosha police, working in collaboration with the City of Kenosha Aldermen, including Alderman Ruffolo, so that the City of Kenosha would have support in shutting Twisterz down, revoking its cabaret license so that it would no longer cater to African Americans with hip hop and rap, or forcing it to change its entertainment program to entertainment which would cater to a Caucasian clientele instead of African Americans.

13

459.   One person had been struck by a bottle on the night of November 10, 2002, but it was not at Twisterz; it was half a blok north in front of a furniture store.

460.   On November 19, 2002, an Open Records Request was made by Mr. Hawkins, through his attorney, for the City of Kenosha Police Department's dash cam tapes and other records from the night of November 10, 2002.  A good deal of the requested material was not produced; the City proposed to charge an exorbitant price for producing it.

461.   The dash cam of Squad 2572 taped the area outside Twisterz at the relevant date and time of the alleged riot, but it does not show any riot-like activity.

462.   In addition, Mr. Hawkins was videotaping Twisterz unbeknownst to the City of Kenosha Police.

463.   Mr. Hawkins's own videotape captured footage of Twisterz during the early morning hours of November 10, the night of the alleged riot at Twisterz.

464.   This video footage shows people leaving Twisterz, but no fighting, no vandalism, and no other riot-like activity.

465.   Nearby business owners and the Director of the Kenosha Uptown Business Improvement District testified before the License and Permit Committee that they did not find anything broken or out of place

on the early morning of November 10, 2002, nor did they even find trash on the ground or any other evidence of a riot.

466.   A business owner who testified in favor of Mr. Hawkins at the License and Permit Committee hearing was brought into the hallway by a committee member and intimidated during the hearing.  He was told he should not be a character witness for Mr. Hawkins because he was not a good judge of character.

467.   On December 9, 2002, the License and Permit Committee held a hearing on revoking the cabaret license of Mr. Hawkins; the complaint was dismissed for procedural flaws by the City Attorney's office.

468.   On December 10, 2002, Jo DeRango, owner of DeRango's Restaurant, was talking to two police officers in his restaurant.  Mr. DeRango called over his African American kitchen manager, Courtney Fergerson, and introduced him to the two officers, jokingly stating that Mr. Fergerson was the one who started the riot at Twisterz.  One of the officers alluded to his plan to start a fight at Twisterz on the upcoming weekend.  Mr. Fergerson pointed out that the police were discriminating against Twisterz.  The officer stated, "It's not discrimination.  There's just too many of *them* in there."

469.   The Kenosha police often use the terms "them" and "those people" to derogatorily and disrespectfully refer to African Americans.

Case 2:07-cv-00712-RTR   Filed 08/06/07   Page 15 of 26   Document 1

470. When the National Association for the Advancement of Colored People contacted the Kenosha police regarding Twisterz's license, the Kenosha police used discriminatory phrases such as, "Everybody knows *those people* tend to be more violent and less respectful of police."

471. On January 2, 2003, Chief Wade requested the revocation of Mr. Hawkins's cabaret license due to a pattern of disorderly conduct which, he alleged, presented a threat to public safety and required a substantial commitment of Kenosha Police Department resources.

472. On January 2, 2003, the City Clerk/Treasurer, Jean A. Morgan, requested the revocation of Mr. Hawkins's cabaret license pursuant to Chief Wade's request.

473. On January 13, 2003, the License and Permit Committee hearings on the revocation of Mr. Hawkins's cabaret license commenced.

474. All in all, Twisterz was called before the License and Permit Committee over 20 times during the relevant time period: Twisterz was called before the License and Permit Committee on 6/24/02, 7/8/02, 10/28/02, 12/9/02, 1/13/03, 1/27/03, 2/6/03, 2/10/03, 2/10/02, 2/24/03, 3/6/03, 3/10/03, 3/13/03, 3/31/03, 4/14/03, 4/28/03, 6/2/03, 7/7/03, 10/6/03, 10/20/03, 11/3/03, and 11/17/03.

475. No other cabaret license holder was called before the license and Permit Committee during the relevant time period at anytime other than license renewal.

476. Neither Chief Wade, nor anyone else, requested the revocation of the licenses of the other Kenosha establishments that required a greater commitment of the Kenosha Police Department for documented incidents threatening to public safety because those establishments all catered to almost exclusively Caucasian clientele.

477. At the Brat Stop, a bar with almost an exclusively Caucasian clientele, a man was stabbed and put in intensive care, but the issue was never brought before the License and Permit Committee.

478. In the period from late 2001 to mid April of 2003, Twisterz had fewer police calls than The Barn, The Brat Stop, S.O.S. Club, K-Mart, Shopko, or Wal-Mart.

479. In the period from late 2001 to mid April of 2003 Twisterz had 107 police calls.

480. In the period from late 2001 to mid April of 2003 The Barn, a tavern catering to a Caucasian clientele, had 256 police calls, yet the issue of The Barn requiring a substantial commitment of police resources was not brought before the License and Permit Committee.

481. In the period from late 2001 to mid April of 2003 The Brat Stop, a tavern catering to a Caucasian clientele, had 187 police calls, yet the issue of The Brat Stop requiring a substantial commitment of police resources was not brought before the License and Permit Committee.

482. In the period from late 2001 to mid April of 2003 The S.O.S. Club, a tavern catering to a Caucasian clientele, had 171 police calls, yet

the issue of The S.O.S. Club requiring a substantial commitment of police resources was not brought before the License and Permit Committee.

483. In the period from late 2001 to mid April of 2003, the K-Mart had 341 police calls – 234 more police calls than Twisterz had during the same period.

484. In the period from late 2001 to mid April of 2003 Shopko had 287 police calls – 180 more police calls than Twisterz had during the same period.

485. In the period from late 2001 to mid April of 2003 the Wal-Mart had 621 police calls – 514 more police calls than Twisterz had during the same period.

486. On April 14, 2003, the License and Permit Committee found that there was a "let out crowd" attracted to Twisterz by the featured entertainment which included individuals present to cause trouble and which drained police resources and threatened the citizens of the City of Kenosha.

487. By "let out crowd," the License and Permit Committee meant, "African American crowd."

488. The License and Permit Committee found that though no other businesses immediately adjacent to Twisterz were open at or near Twisterz's closing time, and despite the testimony to the contrary of the Director of The Uptown Business Improvement District and an area

business owner, the "let out crowd" had a "negative impact on area businesses."

489.   The License and Permit Committee found that Twisterz entertainment, i.e. rap and hip hop, attracts large crowds, and that large crowds were "not per se disorderly but that the crowds which patronize Twisterz *for the featured entertainment* have demonstrated an ongoing and continuing pattern of disorderly conduct." (emphasis supplied.)

490.   The crowds which patronized Twisterz for the entertainment of hip hop and rap were almost exclusively African American crowds.

491.    The License and Permit Committee did not find that Twisterz had any violations of the November 20, 2001 Order of Common Council, yet it sanctioned Twisterz with 200 demerit points, thereby subjecting Mr. Hawkins to having his cabaret license revoked, non-renewed, or suspended at the discretion of the Common Council.

492.   On May 3, 2003, the License and Permit Committee held a hearing on a recommendation to suspend Mr. Hawkins's cabaret license for six months and assessed 75 demerit points against his license.

493.   On June 2, 2003, the License and Permit Committee held a hearing at which 75 demerit points were assessed against Mr. Hawkins's cabaret license and the recommendation for a six month suspension was deferred for 30 days.

494. The City of Kenosha has a custom of harassing, defaming, otherwise interfering with, and shutting down establishments which cater to African American clientele.

495. The City of Kenosha has effectuated the closing down of, in one way or another, every Kenosha night club that catered to African American clientele, including Erv's, Jo Jo's, Neon Nights, and Pizzazz.

496. The City of Kenosha has a custom or policy of putting pressure on night club owners to discontinue certain activities and entertainment which encourage an increase in African American clientele.

497. Even though 7.7% of the population of Kenosha was African American according to the 2000 census, only .03% of the 2002 Kenosha police officers were African American during the relevant time period.

498. For the first time in the history of the civil rights organizations, the League of United Latin American Citizens (LULAC) and the National Association for the Advancement of Colored People (NAACP) – Kenosha Branch joined together to formally protest the actions of the Kenosha police in seeking revocation of Mr. Hawkins's licenses because they felt that the evidence that the revocation was racially motivated was compelling.

499. In part because of the bad publicity Twisterz got due to the discriminatory and otherwise unlawful treatment it received at the hands of the defendants, Mr. Hawkins's business suffered, and for this reason

20

as well as to obtain a respite from the discriminatory and otherwise unlawful treatment it received at the hands of the defendants, he changed his music format to Country and Western in the fall of 2005. In 2006 he sold the business.

## V. VIOLATIONS OF LAW

### A. The Equal Protection Clause of the Fourteenth Amendment: Racially Discriminatory Policing and Enforcement: City of Kenosha Custom or Policy

501. The defendants City of Kenosha and Chief Wade, in their authority as final policymakers, either failed to train or established a wrongful training policy, which led to a widespread practice or custom of discriminating against African Americans and business owners who cater to African American clientele, including the Plaintiff, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### B. The Equal Protection Clause of the Fourteenth Amendment: Racially Discriminatory Policing and Enforcement: Individual Defendants

502. The defendant officers, acting under color of law, as sworn officers of the City of Kenosha Police Department, selectively targeted Twisterz to attempt to effectuate its closing, as the Kenosha police department has a custom of doing to all night clubs which cater to African Americans, and which violated Mr. Hawkins's civil rights and

deprived him of his constitutional rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

503.   The defendants engaged in invidious and intentional discriminatory enforcement of Section 10.07 of the Code of General Ordinances of the City of Kenosha and other activities under color of law, in violation of the Equal Protection Clause of the Fourteenth Amendment.

**C.     Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3): Conspiracy to Deprive of Equal Protection of the Laws**

504.   The defendants conspired for the purpose of depriving Mr. Hawkins of his civil rights and denying him  equal protections and privileges under the law by slandering and harassing his business because his business catered to African Americans, in violation of the Thirteenth Amendment to the United States Constitution and 42 U.S.C. § 1985(3).

**D.     Wis. Stat. § 134.01: Conspiracy to Injure Business**

505.   As a pendant state claim, the defendants combined, associated, and acted in concert for the purpose of willfully and maliciously injuring Mr. Hawkins's reputation, trade and business, and for the purpose of preventing Mr. Hawkins from doing the lawful act of catering to an African American clientele in violation of Wis. Stat. § 134.01.

22

### E. Defamation

506. As a pendant state claim, the defendants communicated and conspired to communicate to third persons, including publishing in a newspaper and otherwise releasing to the press, defamatory matter which brought Plaintiff Hawkins disgrace in society and injury to his business in violation of Wis. Stat. § 942.01.

507. Said defamatory statements were to the effect that Twisterz's customers had engaged in a riot as alleged above.

### F. Tortious Interferance with Contractual Relationships and Prospective Contractual Relationships

508. As a pendant state claim, the defendants acted intentionally to defame and harass Twisterz which they knew was certain to cause third parties to remove their business and otherwise cause interference with Twisterz contractual relations.

### G. Harassment

509. As a pendant state claim, Captain Reschke, acting within the scope of his employment as a City of Kenosha police officer, harassed Mr. Hawkins by jabbing him in the chest and making threats contrary to Wis. Stat. § 947.013.

## VI.   DAMAGES AND EQUITY

### A.   Damages

601.   By virtue of unlawful actions alleged above, Mr. Hawkins sustained economic losses and expenditures, loss of income, professional humiliation, harm to his business and reputation, emotional distress and other damages for which he should be compensated in an amount deemed just by the Court.

602.   Because the acts of the individual defendants herein alleged were carried out maliciously or with reckless disregard for the plaintiff's fundamental rights, the plaintiff seeks awards of punitive damages against the individual defendants to deter them and others similarly situated from similar wrongful acts in the future.

### B.   Equity

603.   For the ongoing discrimination by the defendants, those similarly situated to Mr. Hawkins have no plain, adequate, or speedy remedy at law and thus invokes the Court's equitable jurisdiction to award declaratory relief against the Defendants.

## VII.   CONDITIONS PRECEDENT

701.   All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII.  DEMAND FOR JURY TRIAL

801.  The Plaintiff hereby demands a trial by jury of all issues triable of right to a jury.


## IX.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court grant judgment against the Defendants, awarding them:

901.  Monetary damages in an amount that will fairly compensate the plaintiff for his injuries;

902.   Punitive damages in amount that will justly punish the defendants for their actions;

902.  A declaratory judgment that the City of Kenosha's custom of discriminating against, defaming, and harassing business owners and businesses who cater to African American clientele is a violation of the plaintiff's rights secured by the Fourteenth Amendment to the United States Constitution and Title 42 U.S.C. § 1983, as well as the rights of others not before the Court.

903.  A permanent injunction enjoining the City of Kenosha, its agents, assistants, successors, employees, attorneys, and all persons

acting in concert or cooperation with them or at their direction or under their control from enforcing, implying, or furthering any policy or custom which in any way discriminates against business owners and business who cater to African American clientele.

904.  His costs, attorneys' fees and litigation expenses as well as any further relief this Court deems just.

Dated this 3rd day of August, 2007.

Respectfully submitted,

Steve Hawkins, Plaintiff

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar No. 1016284
ANDREA J. FARRELL
State Bar No. 1064773
131 W. Wilson St., Suite 1200
Madison, WI 53703
Phone:              (608) 283-6001
Facsimile:          (608) 283-0945
E-mail:             jsolson@scofflaw.com

/s/Jeff Scott Olson
_____

Jeff Scott Olson

ATTORNEYS FOR PLAINTIFF